619 So.2d 851 (1993)
Terry Noe JACKSON, Plaintiff-Appellant,
v.
KANSAS CITY SOUTHERN RAILWAY, et al., Defendant-Appellee.
No. 92-1132.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1993.
Dean A. Andrews, William B. Baggett, Robert C. McCall, Robert Charles Arledge, for Terry Noe Jackson.
*852 Patrick Donavon Gallaugher, Jr., for Kansas City Southern R., et al.
James Eugene Williams, for Vista Chemical Co.
Charles Nolen Harper, for Conoco, Inc.
Before DOUCET, KNOLL and COOKS, JJ.
KNOLL, Judge.
This appeal concerns a claim for psychological and emotional injuries suffered by plaintiff, Terry Noe Jackson, while working for defendant, Kansas City Southern Railway Company (KCS). Terry was part of a KCS crew that transported a tank car which had been dripping small amounts of butyl alcohol. Defendant, Vista Chemical Company (Vista), owned the tank car.
Terry initially sued KCS, her employer, under the Federal Employer's Liability Act (FELA), alleging that KCS failed to take reasonable care to protect her from danger in the work place. KCS filed a third-party petition against Conoco, Inc. and its successor, Vista, for reimbursement and indemnification. Subsequently, Terry amended her petition to assert a claim against Vista for negligence under Louisiana tort law. Vista filed an exception of prescription, which was referred to the merits.
After a trial, the jury returned a verdict solely against Vista. The jury awarded Terry the following damages:

"A. Past medical expenses $ 30,000.00
B. Future medical expenses $ 4,000.00
C. Past loss of future earnings $ 60,000.00
D. Future loss of earnings $187,200.00
E. Pain and suffering, and disability, both mental and physical,
 past, present, future $ 0.00
F. Loss of enjoyment of life; past, present and future $ 0.00
 -----------
Total Compensatory Damages to Terry Noe Jackson $281,200.00"

The jury awarded no punitive or exemplary damages.
Following the jury verdict, the trial court granted Vista's exception of prescription. None of the parties appeal the granting of the exception of prescription against Vista; therefore, as to Vista, that judgment is now final. On June 24, 1991, Terry moved for a judgment notwithstanding the verdict seeking to have the trial court enter a JNOV against KCS and award her general damages. She also filed a motion to correct a material omission in the trial record concerning an objection made during a court conference not made part of the record. The trial court originally signed the JNOV. However, on April 30, 1991, the trial court vacated the order granting the JNOV and later denied Terry's motions.
Terry appeals the jury verdict in favor of KCS and the trial court's denial of her motions for JNOV and for correction of a material omission in the trial record. Specifically, she asserts four assignments of error: (1) that the trial court committed manifest error in refusing to grant her JNOV; (2) that the trial court erred in charging the jury that under FELA, plaintiff is not entitled to recover compensation for purely emotional or psychological injuries, unless she proves by a preponderance of the evidence that she suffered actual physical injury; (3) that the trial court erred in failing to allow her to correct the record to reflect a specific objection made off of the record but never made part of the formal trial record; and, (4) that the jury erred in only awarding her special damages without any award for general damages, and that the trial court erred in denying her motion for JNOV to correct the jury's error.
KCS answered the appeal, praying that the damage award, including past or future medical expenses, be reduced in the event we reverse the judgment in its favor on appeal.
For reasons which follow, we affirm the judgment of the trial court.

*853 FACTS
On April 19, 1985, a tank car owned by Vista was loaded with butyl alcohol at the Vista plant in Lake Charles, Louisiana. After the car was loaded, Vista employees found that it was dripping butyl alcohol from the unloading valve centered at the bottom of the car. Carroll Boutte, Vista's pumping and loading supervisor, quantified the drip at approximately 3 to 4 drops per minute. Boutte advised Vista's shipping department not to allow the car to be shipped. Despite this warning, Vista's traffic department allowed the car to be shipped to the Southern Pacific train yard. Once Southern Pacific noticed the leak, it notified Vista, the Louisiana State Police, and the Lake Charles Fire Department.
Errol Cheramie, a hazardous materials officer for the Louisiana State Police, Sidney Pitts, Vista's safety director, and William Gleason, hazardous materials control officer for Southern Pacific, inspected the dripping valve at the Southern Pacific yard. Pitts described the leak as a drop falling from the valve perhaps every ten seconds. Cheramie and Gleason described it as an intermittent drip. Cheramie, John Fontentot, District Fire Chief for the Lake Charles Fire Department, and Merl Rosenthal, Vista's safety engineer, characterized the leak as minor.
Gleason and Pitts crawled beneath the car and attempted to repair the leak by tightening the unloading valve from which the material was dripping. They determined that the cause of the leak was a worn packing gland or O-ring in the valve. They attempted to stop the leak by putting teflon tape in the packing gland and tightening the valve. This procedure significantly reduced, but did not completely stop the drip.
While the car was at the Southern Pacific yard, Cheramie also noticed that some liquid dripped out of the top of the car when the engine banged another car coupled to it. He made the necessary minor repairs to the liquid line and vapor line on top of the car, and terminated the leaking. Terry and the rest of the KCS crew were not present during or prior to the time the repairs were made.
Because they could not completely stop the drip from the valve on the other side of the car, Gleason, Pitts, and Cheramie decided to tape the valve and cover it with 2 plastic bags to assure that no butyl alcohol could escape into the atmosphere in order to return the tank car to Vista's premises safely. The high flammability of the vapors was the primary reason for attempting to contain them.
Cheramie, Pitts, and Gleason worked inches from the leaking valve for approximately 30 minutes to 1 hour. Neither they nor Rosenthal felt any need to wear any protective breathing apparatus; none experienced any discomfort, ill effects, or symptoms typically associated with exposure to high amounts of the chemical, such as eye or throat irritation; and none smelled anything resembling butyl alcohol. These individuals testified that butyl alcohol was no longer leaking from the car, and the car could be transported safely back to Vista for unloading.
Dr. Stanley Pier, an expert environmental toxicologist, explained the properties of butyl alcohol and effects from exposure to it. Butyl alcohol is a clear liquid which evaporates less readily than water and has a highly pungent odor detectable in small concentrations. Butyl alcohol is used as a solvent, as a racing fuel, in photographic development, and is even contained in some alcoholic beverages.
Because it is used in manufacturing processes, the Occupational Safety and Health Administration has established acceptable levels of occupational exposure to butyl alcohol vapors. Dr. Pier testified that in 1985, OSHA recognized 100 parts per million (ppm) concentration in air as the maximum threshold of recommended long-term exposure. Butyl alcohol vapors, in sufficient concentration, 50 to 100 ppm, are irritating to the eyes, nose, and throat. The chemical can be smelled at concentrations as low as 10 to 11 ppm, far below the threshold of 50 ppm at which any symptoms of exposure occurs, and far below the OSHA standard for occupational exposure.
*854 Dr. Pier testified that only a prolonged and massive exposure to hundreds of parts per million of butyl alcohol vapors can produce symptoms such as dizziness and nausea. He testified that to be exposed to such a concentrated amount of butyl alcohol, "you'd have to be either right above a big vat of the stuff or at least be in an enclosed space ... where the vapors could accumulate." Also, an odor would be detectable and eye irritation would occur if butyl alcohol vapors were present in an amount sufficient to produce symptoms such as nausea and dizziness.
After the leak had been repaired so that butyl alcohol was no longer escaping, Southern Pacific transported the car back to Little Pass for KCS to deliver it to Vista. The delivery from Little Pass to the Vista plant required moving the car a short distance, 1 or 2 miles, and took approximately 15 to 30 minutes. Terry worked as part of the KCS crew as a brakeman, coupling and uncoupling cars from the train engine.
Roy Stanley, conductor of the KCS train which arrived at Little Pass to transport the car, testified that he crouched down and inspected the valve taped over with plastic bags, smelled no unusual odors and saw no evidence of leakage, and determined that the leak was secured. He testified that had there been any doubt in his mind that the car was still leaking, he would not have transported it. Walter Doucet, the KCS engineer who picked up the car at Little Pass, and Paul Pinkenton, another brakeman on the crew, did not smell anything or experience any symptoms similar to those Terry experienced.
After he inspected the car for leakage, Stanley allowed Terry to couple the car to the train engine. Terry testified that she coupled the car to the engine, then walked to the rear of the car to release the brake. Then she rode on the back of the tank car approximately 100 feet to the main line, and then boarded the engine for the trip to Vista.
Arriving at the Vista gate, the crew was met by Pitts and Rosenthal, both of whom had participated in the repair work on the car at the Southern Pacific yard. Pitts and Rosenthal again inspected the repair work and ascertained that the bags were still taped, intact, and not leaking. The car was then backed to a specific location where Terry uncoupled it and locked the brakes. She flagged the engine out of the Vista gate and boarded it. Terry stated that she never got closer to the valve than 10 to 15 feet.
After boarding the engine upon returning the car to the Vista plant, Terry claims that she began to feel dizzy and faint. Although it was the end of her shift, she had eaten nothing all day. Also, 8 days before the incident, on April 12, 1985, she had visited her family physician, Dr. John Hearn, suffering from a severe bacterial infection of the respiratory system. She smokes 1½ to 2 packs of cigarettes per day. Terry, like her co-workers, and others called to inspect and repair the tank car, never smelled anything out of the ordinary while handling the car and never experienced any eye irritation.
Terry returned to her Leesville home, took a shower, and went to bed feeling nauseous and dizzy. She testified that James Lashely, the KCS train master in Lake Charles, woke her the next morning by calling to tell her to go to the hospital emergency room to determine if her symptoms might be related to butyl alcohol vapors. She went to the emergency room of Byrd Memorial Hospital and "a doctor gave her a shot." The next day she visited Dr. Hearn at his office, and advised him that she had breathed toxic fumes. She also complained of a severe headache, nausea, and vomiting.
A pathologist's report referred to lung markings. Dr. Hearn felt that the markings could be a response to inhalation of noxious fumes. Otherwise, Dr. Hearn's examination of Terry uncovered none of the physical complications commonly associated with severe butyl alcohol exposure. Lab work performed during the emergency room visit and subsequent lab work done by Dr. Hearn's office produced normal results. Dr. Hearn treated Terry through May of 1985 for headaches, tonsillitis, anxiety, and bronchial inflammation.
*855 Terry recovered from her symptoms and returned to work for KCS in September of 1985. In January of 1986, Terry took leave for gynecological problems which eventually necessitated a hysterectomy and colostomy in February of 1986. Thereafter, she returned to work until December 23, 1986, after which she refused to return to work. Terry claims that she cannot return to work for KCS because she is afraid she might again be exposed to a chemical and fears that she might hurt a coworker. However, at the time of trial, KCS still had Terry posted on its "extra board," meaning that she could be called to work when a regularly scheduled crew member is unable to work.
Terry seeks recovery solely for psychological injuries. At trial, Terry sought to prove that she is a person unusually susceptible to developing psychological problems as a result of her unusually tragic past. Terry admits that she has experienced several stressful and depressing events. The record shows that Terry's mother abandoned her at an early age, was an alcoholic, and committed suicide. Her paternal grandmother raised her, as she rarely saw her alcoholic father. One of her brothers was killed in a motorcycle accident in 1969 when Terry was 21 years of age. Another died in 1983. The cause of his death was either suicide or homicide. One sister is also an alcoholic.
Terry was married to her first husband, Mr. Noe, for 16 years and had three children by him. He became physically abusive when he returned from Vietnam. During this marriage, Terry unsuccessfully attempted suicide. In August of 1979, they divorced.
Her second husband, Jim Edwards, left the marital home after Terry took him to court for hitting her daughter. In an unrelated incident eight months later, he was arrested and incarcerated in Georgia, and their marriage was dissolved. The daughter was placed in a foster home for 1 to 1½ months.
Two years later, Terry married Mr. McDaniels. She left him shortly thereafter in February of 1986 because he was an alcoholic. He died in June of 1986. In August of 1986, Terry married her current husband, William Jackson.
In 1983, her home burned down. Her claim for damages as a result of the fire was set for trial the Thursday after the alleged butyl alcohol exposure. The outcome of that litigation was that the damage was not covered by insurance. The cause of the fire was proved to be arson. Also, the military house insurance no longer covered the home since she had divorced Mr. Noe.
In addition to the hysterectomy and colostomy, plaintiff underwent gallbladder surgery in 1967, a tubal ligation in 1971, and suffered from blood clots. These ailments, however, are not causally related to the alleged exposure to butyl alcohol.
Since the alleged exposure, Terry has visited a litany of physicians. Initially, she saw the railroad's physician, Dr. Hearn. Additionally, she saw a surgeon, Dr. Ghanta, who referred her to a neurologist, Dr. Victor Rivera. Dr. Rivera in turn referred her to a toxicologist, Dr. Daniel Goldstein. Dr. Goldstein prescribed Demerol and recommended that she see a psychiatrist. She saw Dr. Causey, an internist, who referred her to Dr. Lynn Goodin, a psychiatrist.
The psychiatrists and physicians who testified agreed that this background of emotional trauma and depression had rendered Terry emotionally fragile and psychologically unable to cope in a normal way with stressful events in her life. The doctors agree that there was no evidence of a physical injury caused by the supposed chemical exposure, and they agree that Terry can return to work. They testified that Terry tends to distort and exaggerate the significance of the April 19, 1985, incident and to view it as the source of all of her problems and unhappiness.
Dr. Rivera feels that Terry's headaches are a reaction to stress. He testified as follows:
"There was no evidence of brain neuropsychological dysfunction, as it happens with some people that have brain damage or brain injury. She did not exhibit features *856 of such; but the personality test showed that she indeed had significant psychological manifestations, psychological stress without the presence of usual or common coping skills. She was mildly depressed, and it was also found that due to her psychological dysfunction, she was very prone to symptom exaggeration, particularly when distressed or stress increased."
Dr. Goldstein testified as follows:
"[Terry] has a strong tendency for denial and withdrawal in dealing with various stressors; and ... [has] obtained some significant secondary gain as well in terms of relief from household responsibilities and from work.... There are subconscious factors that are responsible for all these difficulties, and for the persistence of her fixation on this particular traumatic event ... We're not dealing with an organic illness here. We're dealing with her own psychological perceptions of that event."
He further opined:
"Mrs. Jackson appears to be overwhelmed by her chemical exposure and her other unrelated medical illnesses and has become fixed on her chemical exposure as the cardinal event which has determined her existence since that time. She is persistently reluctant to look forward to solutions to her problems."
Dr. Goodin found that Terry tended to convert stress, depression, and other negative feelings into somatic complaints, i.e., physical symptoms such as headaches. Dr. Goodin and Terry testified that Terry had often suffered minor headaches prior to the alleged exposure, and that, by the time of trial, the headaches had lessened. Dr. Goodin feels that multiple causes contribute to Terry's depression, including her family history, her chemistry, and various stressors. Dr. Goodin testified that an MMPI indicates that Terry possibly exaggerates her symptoms and advised Terry that her fear of contracting cancer from the alleged exposure was unrealistic. Dr. Goodin felt that even if Terry had not been exposed to butyl alcohol, but merely thought she had been, she could experience the same headaches.
Terry argues that the lung markings were caused by exposure to butyl alcohol. Dr. Pier testified that exposure to butyl alcohol would not cause lung markings, and Terry's smoking 1½ to 2 packs of cigarettes per day is the logical explanation for any lung markings. Terry presented no evidence to contradict his conclusion. Dr. Pier would conclude that Terry had no exposure of significance at all.
Dr. Paul D. Ware, a medical doctor who specializes in psychiatry and neurology diagnosed Terry as having headache, tension or muscular in nature, and an adjustment disorder of adulthood and depressed mood. He opined that her headaches are unrelated to any alleged exposure to a toxic chemical.
She showed no evidence of clinical depression at the time he examined her, possibly due to medication. Dr. Ware considered her prognosis to be excellent, and felt that she would benefit greatly from returning to work. He found no evidence of brain or nervous system damage as a result of any toxic exposure.

RECOVERY FROM KCS NOT WARRANTED
Terry contends that the trial court committed manifest error in refusing to grant her JNOV, which she claims would have corrected the jury's error in failing to return a verdict against KCS. Terry admits that she suffered no physical injury, but instead claims that she sustained purely emotional and psychological injuries. Terry attacks the trial court's charge to the jury concerning FELA, charging that she is not entitled to recover compensation for purely emotional or psychological injuries unless she proves by a preponderance of the evidence that she suffered actual physical injury. For reasons more fully explained below, we reject this assertion.
The standard for determining whether to grant a JNOV is clearly established. In Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986), the Supreme Court explains that the granting of a motion for JNOV is proper when the trial court believes that *857 the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at a contrary verdict. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach a different conclusion, the trial court should deny the motion. In reviewing whether a trial court properly performed its duty, an appellate court applies a manifest error standard of review. Cash v. Charter Marketing Co., 607 So.2d 1036 (La.App.3rd Cir.1992).
Initially, we address Terry's contention that the trial court erroneously charged the jury that, under FELA, Terry may not recover for purely psychological injuries unless she proved by a preponderance of the evidence that she suffered physical injury. The trial court instructed the jury as follows:
"[Vista had a duty to] exercise that degree of care which we might reasonably expect from an ordinarily prudent person under the same or similar circumstances.... The ordinarily prudent person will avoid creating an unreasonable risk of harm....
[KCS had a duty] to exercise ordinary care under the circumstances to provide its employees with a reasonably safe place to work.... The duty is a continuing one and requires a jury to weigh a myriad of factorsincluding the nature of the task, its hazards and effortsin determining whether an employer furnished an employee with a safe place to work....
Under the Federal Employers' Liability Act, the plaintiff is not entitled to recover compensation for purely emotional or psychological injuries, unless the plaintiff proves, by a preponderance of the evidence, that she suffered actual physical injury from inhaling a chemical on April 20, 1985. This principle is only true in relation to the plaintiff's claim against Kansas City Southern Railway Company.
Under Louisiana Civil Code article 2315, plaintiff can recover against Vista Chemical for purely emotional or mental injury without the necessity of a prerequisite physical injury if proved by a preponderance of the evidence."
After several hours of deliberations, the jury sent a written question to the court, inquiring: "if we found Vista or KCS were not liable for any physical damages, could they be found liable for psychological damages." The trial court reread the jury instructions, and the jury thereafter returned with its verdict, finding Vista 100% negligent, and finding no negligence, "in whole or in part," on behalf of KCS.
The record shows that Terry's counsel never lodged an objection concerning the jury instructions for the record. LSA-C.C.P. Art. 1793(C) provides:
"A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection."
Terry asserts that her objection to the charge was made in an in camera, off the record jury charge conference held in the judge's chambers. That is not sufficient to preserve the objection on the record as required by LSA-C.C.P. Art. 1793(C). Smiciklas v. Groendyke Transport, Inc., 505 So.2d 775 (La.App.2nd Cir.1987), writ denied, 506 So.2d 1231 (La.1987). Thus, we find that Terry cannot now raise the issue on appeal. However, because able counsel for plaintiff makes a persuasive argument that the charge was erroneous, we comment as though the objection was properly preserved.
KCS's liability is governed by the federal substantive law set forth in FELA. FELA allows recovery of damages for personal injuries to an employee of a railroad if the injuries resulted "in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. section 51. Under FELA, a railroad will be liable if its negligence played any part, however slight, in producing an employee's *858 injury. Armstong v. Kansas City Southern Ry. Co., 752 F.2d 1110 (5th Cir. 1985). Because FELA makes an employer liable if an injury results only in part from his negligence, the common law proximate cause standard is modified, and the employee has a less demanding burden of proving a causal relationship. Id. (citing Nivens v. St. Louis Southwestern Railway Company, 425 F.2d 114 (5th Cir.1970). Nevertheless, the employee still has the burden of proving that the employer, with the exercise of due care, could have reasonably foreseen that a particular condition could cause injury; foreseeability is an essential ingredient of negligence under FELA. Id. (citing Gallick v. Baltimore & O. R.R., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 [1963]). Jurisprudence, however, recognizes that FELA does not make an employer an insurer, and it was never intended to hold an employer absolutely liable for work place injuries. Conway v. Consolidated Rail Corp., 720 F.2d 221 (1st Cir.1983).
Jurisprudence from the United States Fifth Circuit Court of Appeal indicates that the Fifth Circuit has not yet finally disposed of the issue of whether a claim for a purely emotional injury caused by an employer's negligence, without an accompanying physical injury or physical contact, is cognizable under FELA.
In Plaisance v. Texaco, Inc., 937 F.2d 1004 (5th Cir.1991), amended and affirmed on rehearing, 966 F.2d 166 (5th Cir.1992), a tugboat captain and his spouse sued for alleged emotional injury from watching a fire. On the day of the fire, Plaisance was operating a tug which was towing a barge on a relatively short tow line. A second tug was tied to the rear of the barge. A gas pipe line ruptured, and an explosion and fire ensued. The fire was confined to the rear of the barge and the front of the trailing tug. The tether lines between the two burned, and the trailing tug began to drift. The fire was extinguished in 30 minutes, and no one was injured.
Subsequently, Plaisance began complaining of psychological injuries, namely post-traumatic stress disorder and depression resulting from his perception that he and the others could have been injured or killed. The plaintiffs sought recovery under the Jones Act and its underlying statutory structure, FELA, for purely emotional injury.
Originally, Judge Politz, writing for the majority, cited Atchison, T. & S.F.R. Co. v. Buell, 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987)[1] in which the United States Supreme Court considered the issue of recovery for purely emotional injuries under FELA, but declined to decide whether FELA permitted such claims. Instead, the Supreme Court could not answer the question of whether a purely mental injury is cognizable under FELA because the record had not been fully developed on the exact nature of the allegedly tortious activity, or to the extent of injuries that respondent claims to have suffered.
The Supreme Court went on to state:
"The question whether `emotional injury' is cognizable under the FELA is not necessarily an abstract point of law or a pure question of statutory construction that might be answerable without exacting scrutiny of the facts of the case. Assuming, as we have, that FELA jurisprudence gleans guidance from common-law developments, see Urie v. Thompson, 337 U.S. [163], at 174, 69 S.Ct. [1018], at 1026 [93 L.Ed. 1282 (1949)], whether one can recover for emotional injury might rest on a variety of subtle and intricate distinctions related to the nature of the injury and the character of the tortious activity. For example, while most States now recognize a tort of intentional infliction of emotional distress, they vary in the degree of intent required to establish liability, and the level of physical manifestation of the emotional injury required to support recovery. Moreover, some States consider the context and the relationship between the parties significant, placing special emphasis on the workplace. In addition, although many States have now recognized *859 a tort of negligent infliction of emotional distress, they too vary in the degree of objective symptomatology the victim must demonstrate. These issues are only exemplary of the doctrinal divergences in this area. In short, the question whether one can recover for emotional injury may not be susceptible to an all-inclusive `yes' or `no' answer. As in other areas of law, broad pronouncements in this area may have to bow to the precise application of developing legal principles to the particular facts at hand." (Footnotes omitted).
Judge Politz's interpretation of Atchison, with which we agree, led him to conclude that a claim for an emotional injury caused by emotional distress negligently inflicted, even without an accompanying physical injury or physical contact, is cognizable under FELA if the purely emotional injury is reasonably foreseeable.
In Plaisance, the court noted that a "plaintiff's claimed emotional injury must result from a situation in which a reasonable person, normally constituted, would not be able to cope adequately with the mental distress occasioned by the circumstances." (Footnote omitted.) Furthermore, the court recognized that "seamen and railroaders have chosen callings that `involve braving certain hazards [which] are traditionally not well suited to the squeamish or faint hearted.' [citing Gaston v. Flowers Transp., 866 F.2d 816 (5th Cir. 1989) ]. In evaluating claims of emotional injury, courts must attribute to those who choose these callings the appropriate daring and strength and quality of character." The court then concluded that the injury complained of was a not a reasonably foreseeable consequence of the alleged negligence, i.e., Plaisance's emotional reaction was not a reasonably foreseeable reaction expected from a normally constituted seaman.
On rehearing, the Fifth Circuit found that plaintiff's injury was not reasonably foreseeable and specifically refused to decide whether or under what circumstances it might permit recovery of damages for purely emotional injuries. The Plaisance court emphasized that Gaston, supra, continues to represent the law. In Gaston, a seaman brought suit under the Jones Act for purely emotional injuries he allegedly suffered when he saw his half-brother crushed to death between two vessels. A panel of this court affirmed the district court's dismissal of Gaston's action. The court reasoned that construing the Jones Act to cover a bystander's injuries would represent a major departure from the existing jurisprudence. The court's limited holding recognized that a plaintiff suing for purely emotional injuries could recover if he also suffered physical injury. The court in Plaisance noted that Gaston left open the question of whether a plaintiff may recover for purely emotional injuries under a zone of danger theory.[2]
In Ainsworth v. Penrod Drilling Corp., 972 F.2d 546 (5th Cir.1992), a crew member on a deck of a jack-up rig sued the operator of a helicopter which crashed and exploded on the deck of the rig. He sued under the Jones Act and general maritime law alleging that, as a result of the accident and the crew's attempt to rescue survivors, he sustained damages for fright, fear, and mental anguish.
The Fifth Circuit noted that Ainsworth had suffered no physical contact or impact. The court found that any physical injuries he experienced, i.e., upset stomach, headaches, or a pulled muscle, were trivial and did not support recovery. Hence, the principle developed that a trivial physical injury suffered by a plaintiff is not sufficient reason to allow plaintiff to recover for an emotional injury. The court concluded that Ainsworth could not recover under the zone of danger doctrine because the record showed that the crash neither threatened him with actual or imagined physical harm.
In Briscoe v. Devall Towing & Boat Service, 799 F.Supp. 39 (W.D.La.1992), the district court summarized the above mentioned *860 cases, and specifically interpreted Ainsworth, supra, as setting forth that a plaintiff may only recover for an emotional injury that results from the physical contact.
While Gaston, Plaisance, and Ainsworth may have refused plaintiff's recovery for purely emotional injuries, we find that none of these Fifth Circuit cases have squarely decided whether and under what circumstances a plaintiff might recover damages for purely emotional injuries. What is obvious to us, however, is that the jury could have reasonably found that Terry is not entitled to recover for her alleged purely psychological injuries because they were not a foreseeable result of any negligent act of KCS.
The evidence strongly suggests that Terry was never actually exposed to butyl alcohol, but, instead, only believes she was. The record shows that the leak had been repaired prior to the time Terry and the rest of her crew arrived at Little Pass to transport the car back to Southern Pacific.
Expert testimony indicates that an odor would have been easily detected had there existed high enough levels of butyl alcohol to produce any adverse effects. However, none of the witnesses, including those in the vicinity of the tank car, those who went under the car to repair it, and Terry herself, experienced any of the expected symptomatology or smelled butyl alcohol. The record supports a finding that Terry did not breath a significant amount of butyl alcohol vapors.
Indeed, the medical and psychiatric evidence adduced at trial failed to show any organic injury to Terry. All testified that her symptoms, namely headaches, are psychologically induced and are caused by an unusual, obsessive reaction to a perceived chemical exposure. Terry herself even acknowledged that her problem is psychological in origin. The jury could have easily found that such a reaction to the mere possibility of exposure was not foreseeable and not something expected of an average, normally constituted railroad worker. Moreover, the jury could have reasonably determined that the various other stressful factors in her personal life, some of which occurred after the April, 1985 incident, and not the alleged exposure, caused her stress and resulting emotional injury. Accordingly, even had the jury been properly instructed, we find that the evidence would not support granting her relief under FELA.
Terry argues that KCS violated 49 CFR sections 100177 by failing to inspect the leaky tank car prior to removing it from Vista's premises. However, the record shows that Stanley of KCS made a reasonable inspection of the car and determined to his satisfaction that it was not leaking prior to allowing Terry to couple it to the train for transportation. Moreover, 49 C.F.R. section 174.50(a) indicates that it was not a violation to move the car once the bags had been secured under the valve. The regulation provides in pertinent part that "[i]n the case of a small leak, short movements may be made if a receptacle is attached under the leak to prevent the spread of the liquid over the tracks." We find that the record before us contains facts which support the jury's verdict. We cannot find the verdict to be clearly erroneous; thus, we may not set aside the verdict. See, Polotzola v. Missouri Pacific R. Co., 610 So.2d 903 (La.App.1st Cir.1992).
Finally, Terry contends that the jury committed manifest error in awarding her special damages without also awarding general damages for pain and suffering and loss of enjoyment of life. Vista, against whom the jury imposed its verdict awarding Terry special damages, does not seek to have those damages reduced, because the trial court dismissed all claims against it on an exception of prescription. KCS, out of an abundance of caution, filed an answer to the appeal, asking that damages found by the jury be reduced in the event the judgment was reversed as to KCS. Because we find that the jury did not abuse its discretion in finding no liability on the part of KCS, the issue is moot, and we need not address it.
For the above and foregoing reasons, the judgment of the trial court is affirmed. *861 Costs of this appeal are taxed to plaintiff, Terry Noe Jackson.
AFFIRMED.
NOTES
[1] The Atchison case arose in the United States Ninth Circuit, which was the first circuit to recognize a claim under FELA for purely emotional injuries.
[2] The zone of danger doctrine provides for recovery for emotional injuries resulting from the witnessing of a peril or harm to another if the plaintiff is also threatened with physical harm as a consequence of the defendant's negligence.